No. 22-40225

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

**YOUNG CONSERVATIVES OF TEXAS FOUNDATION,**
*Plaintiff-Appellee*

v.

**NEAL SMATRESK, PRESIDENT OF THE UNIVERSITY OF NORTH TEXAS; SHANNON GOODMAN, VICE PRESIDENT FOR ENROLLMENT OF THE UNIVERSITY OF NORTH TEXAS,**
*Defendants-Appellants*

---

On Appeal from the United States District Court
for the Eastern District of Texas, Sherman Division
No. 4:20-CV-00973-SDJ

---

**APPELLEE'S BRIEF**

---

Robert Henneke
rhenneke@texaspolicy.com
Chance Weldon
cweldon@texaspolicy.com
Christian Townsend
ctownsend@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone: (512) 472-2700
Facsimile: (512) 472-2728

No. 22-40225

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

**YOUNG CONSERVATIVES OF TEXAS FOUNDATION,**
*Plaintiff-Appellee*

v.

**NEAL SMATRESK, PRESIDENT OF THE UNIVERSITY OF
NORTH TEXAS; SHANNON GOODMAN, VICE PRESIDENT FOR
ENROLLMENT OF THE UNIVERSITY OF NORTH TEXAS,**
*Defendants-Appellants*

On Appeal from the United States District Court
for the Eastern District of Texas, Sherman Division
No. 4:20-CV-00973-SDJ

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualifications or recusal.

Appellants:             Neal Smatresk, President of the University of
                        North Texas

Shannon Goodman, Vice President for Enrollment for the University of North Texas

Appellate Counsel:

Wallace B. Jefferson
Texas Bar No. 00000019
wjefferson@adjtlaw.com
Amy Warr
Texas Bar No. 00795708
awarr@adjtlaw.com
Melanie D. Plowman
Texas Bar No. 24002777
mplowman@adjtlaw.com
Alexander, Dubose & Jefferson LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701-3562
Telephone:     (512) 482-9300
Facsimile:     (512) 482-9303

Sandy Hellums-Gomez
Texas Bar No. 2403670
sandy.gomez@huschblackwell.com
Jeff Nobles
Texas Bar No. 15053050
jeff.nobles@huschblackwell.com
Husch Blackwell, LLP
600 Travis Street, Suite 2350
Houston, Texas 77002
Telephone:     (713) 647-6800
Facsimile:     (713) 647-6884

Trial Counsel:

Andy Taylor
Texas Bar No. 19727600
ataylor@andytaylorlaw.com
Andy Taylor & Associates, PC
2628 Highway 36 South #288
Brenham, Texas 77833
Telephone:     (713) 222-1817
Facsimile:     (713) 222-1855

Paige Carlysa Duggins-Clay
(*withdrew 6/29/22*)
Texas Bar No. 24105825
paige.duggins-clay@idra.com
Intercultural Development Research Association
5815 Callaghan Road, Suite 101
San Antonio, Texas 78228
Telephone:    (210) 444-1710
Facsimile:    (210) 444-1714

Appellee:                 Young Conservatives of Texas Foundation

Trial & Appellate Counsel:    Robert Henneke
Texas Bar No. 24046058
rhenneke@texaspolicy.com
Chance Weldon
Texas Bar No. 24076767
cweldon@texaspolicy.com
Christian Townsend
Texas Bar No. 24127538
ctownsend@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone:    (512) 472-2700
Facsimile:    (512) 472-2728

Trial Counsel:            Chad Phillip Ennis
(*withdrew 2/11/22*)
Texas Bar No. 24045834
cennis@sos.texas.gov
Texas Secretary of State
1019 Brazos Street
Austin, Texas 78701
Telephone:    (512) 463-5560

Joseph Aaron Barnes, Sr.
(*withdrew 7/29/21*)
Texas Bar No. 24099014
aaron.barnes@oag.texas.gov
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone:    (512) 936-2021
Facsimile:    (512) 457-4410


*/s/Chance Weldon*
CHANCE WELDON
Attorney of Record for Plaintiffs

## STATEMENT REGARDING ORAL ARGUMENT

The Young Conservatives of Texas do not oppose the University of North Texas Officials' request for oral argument.  The preemption issues in this case should be straightforward.  The district court's interpretations of both state and federal law do not conflict with any other court to address these issues.  Nonetheless, because the Appellants' briefing attempts to obscure and overcomplicate the issues in this case, oral argument may be beneficial to the Court.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................ ii

STATEMENT REGARDING ORAL ARGUMENT ................................. vi

TABLE OF AUTHORITIES ................................................................... ix

ISSUES PRESENTED ........................................................................... 1

STATEMENT OF THE CASE ............................................................... 3

SUMMARY OF THE ARGUMENT ........................................................ 9

STANDARD OF REVIEW .................................................................... 13

ARGUMENT ........................................................................................ 13

I.     THE DISTRICT COURT RIGHTLY HELD THAT SECTION
       54.051(D) IS PREEMPTED BY THE PLAIN TEXT OF
       SECTION 1623 .......................................................................... 13

       A.     UNT's application of Section 54.051(d) to United States
              citizens is expressly preempted by Section 1623 ................. 14

       B.     UNT's application of Section 54.051(d) to United States
              citizens is also barred by conflict preemption, because
              university officials cannot simultaneously comply with
              Section 54.051(d) and the demands of Section 1623 ........... 17

       C.     UNT's arguments against preemption have no basis in
              law ...................................................................................... 19

              1.    Preemption does not require any magic words ........... 19

2.    The best indication of legislative intent is the text of the statute Congress adopted .................................. 20

3.    Contrary to UNT's assertion, eligibility for resident tuition is based on residence ......................... 22

4.    The cases cited by UNT do not help its argument ...... 25

II.    THE DISTRICT COURT RIGHTLY HELD THAT YCT HAS STANDING TO CHALLENGE A STATUTE THAT REQUIRES ITS MEMBERS TO PAY TUITION RATES THAT ARE NINE-TIMES HIGHER THAN WHAT IS ALLOWED UNDER FEDERAL LAW ........................................... 29

III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ENJOINING THE APPLICATION OF SECTION 54.051(D) AT UNT AFTER A FULL MERITS DETERMINATION THAT THE STATUTE IS UNCONSTITUTIONAL .................................................. 34

A.    Continuing to apply an unconstitutional tuition statute to UNT's members would be irreparable harm .................... 37

B.    A 0.68% reduction in UNT's proposed budget does not outweigh UNT's obligation to comply with the Constitution ......................................................... 40

C.    Preventing UNT's ongoing violation of federal law serves the public interest ....................................... 42

CONCLUSION ......................................... 44

CERTIFICATE OF SERVICE .................................................. 46

CERTIFICATE OF COMPLIANCE ........................................ 47

# TABLE OF AUTHORITIES

*Cases:*                                                                      *Page(s):*

*Air Evac EMS, Inc. v. Sullivan,*
    331 F. Supp. 3d 650 (W.D. Tex. 2018) ........................................... 35

*Alabama v. North Carolina,*
    560 U.S. 330 (2010) ...................................................................... 24

*Am. Civil Liberties Union v. Ashcroft,*
    322 F.3d 240 (3d Cir. 2003) .......................................................... 36

*Armstrong v. Exceptional Child Ctr., Inc.,*
    575 U.S. 320 (2015) ...................................................................... 26

*Arnold v. Barbers Hill Indep. Sch. Dist.,*
    479 F. Supp. 3d 511 (S.D. Tex. 2020) ........................................... 39

*Awad v. Ziriax,*
    670 F.3d 1111 (10th Cir. 2012) ..................................................... 36

*Brackeen v. Haaland,*
    994 F.3d 249 (5th Cir. 2021) ........................................................ 33

*BST Holdings, L.L.C. v. OSHA,*
    17 F.4th 604 (5th Cir. 2021).................................. 35, 37, 40, 41, 42

*Chamber of Com. of U.S. v. Whiting,*
    563 U.S. 582 (2011) ................................................................ 15, 21

*Cipollone v. Liggett Grp.,*
    505 U.S. 504 (1992) ...................................................................... 17

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.*,
    779 F.3d 258 (5th Cir. 2015) ......................................................... 30

*Coventry Health Care of Mo., Inc. v. Nevils*,
    137 S.Ct. 1190 (2017) ..................................................................... 19

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) ............................................................... 14, 35

*Day v. Bond*,
    500 F.3d 1127 (10th Cir. 2007) ................................................... 26

*Douglas v. Seacoast Products, Inc.*,
    431 U.S. 265 (1977) ....................................................................... 35

*ESI/Employee Sols., L.P. v. City of Dall.*,
    531 F. Supp. 3d 1181 (E.D. Tex. 2021) ................................... 34, 35

*Est. of Miranda v. Navistar, Inc.*,
    23 F.4th 500 (5th Cir. 2022)......................................................... 14

*Equal Access Educ. v. Merten*,
    305 F. Supp. 2d 585 (E.D. Va. 2004)................................. 15, 19, 26

*Ex parte Young*,
    209 U.S. 123 (1908) .................................................................. 6, 26

*Freedom from Religion Found., Inc. v. Mack*,
    4 F.4th 306 (5th Cir. 2021)........................................................... 25

*Ga. Latino All. for Human Rights v. Governor of Ga.*,
    691 F.3d 1250 (11th Cir. 2012) ................................................... 36

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
    505 U.S. 88 (1992) ............................................................... 14, 19

*Henry v. Greenville Airport Com.*,
284 F.2d 631 (4th Cir. 1960) ......................................................... 36

*Hillsborough Cty. v. Automated Med. Labs., Inc.*,
471 U.S. 707 (1985) ...................................................................... 13

*Ingersoll-Rand Co. v. McClendon*,
498 U.S. 133 (1990) ...................................................................... 19

*Jackson Women's Health Org. v. Currier*,
760 F.3d 448 (5th Cir. 2014) ......................................................... 42

*Janvey v. Alguire*,
647 F.3d 585 (5th Cir. 2011) ......................................................... 38

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ...................................................................... 32

*Martinez v. Regents of Univ. of Cal.*,
50 Cal. 4th 1277 (2010) ................................................. 20, 22, 23, 28

*Mitchell v. Pidcock*,
299 F.2d 281 (5th Cir. 1962) ......................................................... 40

*Montgomery v. Louisiana*,
577 U.S. 190 (2016) ...................................................................... 41

*Nat'l Fed'n of Indep. Bus. v. DOL, OSHA*,
142 S.Ct. 661 (2022) ............................................................... 35, 41

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ...................................................................... 38

*NLRB v. Canning*,
573 U.S. 513 (2014) ...................................................................... 38

*N.Y. Progress & Prot. PAC v. Walsh*,
  733 F.3d 483 (2d Cir. 2013) ...................................................... 35, 36

*Oneok, Inc. v. Learjet, Inc.*,
  575 U.S. 373 (2015) ........................................................ 17

*Puerto Rico v. Franklin Cal. Tax-Free Trust*,
  579 U.S. 115 (2016) ................................................ 14, 15

*Robinson v. Orient Marine Co.*,
  505 F.3d 364 (5th Cir. 2007) .......................................... 13

*Scott v. Schedler*,
  826 F.3d 207 (5th Cir. 2016) .......................................... 13

*State ex rel. Brnovich v. Maricopa Cty. Cmty. Coll. Dist. Bd.*,
  243 Ariz. 539 (2018) ................................................ 15, 16, 20, 27

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ................................................ 29, 30

*Tatro v. Texas*,
  625 F.2d 557 (5th Cir. 1980) .......................................... 39

*Tex. Entm't Ass'n v. Hegar*,
  10 F.4th 495 (5th Cir. 2021) .......................................... 29

*Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*,
  Civil Action No. 3:08-CV-1724-D, 2008 U.S. Dist. LEXI 95991
  (N.D. Tex. Nov. 25, 2008) .............................................. 35

*Texas v. United States EPA*,
  829 F.3d 405 (5th Cir. 2016) .......................................... 37, 39

*Torres v. Precision Indus.*,
    938 F.3d 752 (6th Cir. 2019) ......................................................... 14

*Trans World Airlines, Inc. v. Mattox*,
    897 F.2d 773 (5th Cir. 1990) .............................................. 35, 37, 40

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ......................................................................... 33

*VRC LLC v. City of Dall.*,
    460 F.3d 607 (5th Cir. 2006) .......................................................... 34

*Young Conservatives of Tex. Found. v. Univ. of N. Tex.*,
    No. 4:20-CV-973-SDJ, 2022 U.S. Dist. LEXIS 114210
    (E.D. Tex. June 28, 2022) ......................................... 5, 8, 25, 26, 39

## Statutes:

8 U.S.C.
    § 1621(a) ........................................................................................ 2
    § 1621(d) ..................................................................................... 2, 3
    § 1623 ........................................................... 3, 14, 17, 19, 20, 21, 23

Tex. Gov't Code
    § 403.202 ....................................................................................... 38

Tex. Educ. Code
    § 54.051(d) ................................................................ 1, 4, 7, 16, 33
    § 54.051(3) .................................................................................... 21
    § 54.052 ................................................................................... 16, 21
    § 54.053 ......................................................................................... 16
    § 54.0513 ....................................................................................... 32

*Other Authorities:*

Acts 2001, 77th Leg., 2001 Tex. Ch. 1392, 2001 Tex. HB 1403, Sec. 2
    Effective June 16, 2001 ..................................................................... 4

**ISSUES PRESENTED**

This is a federal preemption case. 8 U.S.C. § 1623 prohibits state universities from simultaneously: (1) making unlawfully present aliens eligible for in-state tuition on the basis of residence within a state, and (2) denying in-state tuition to United States citizens who are not residents of that state.

At the same time, Texas law: (1) makes unlawfully present aliens eligible for in-state tuition on the basis of residence within Texas, and (2) denies in-state tuition to United States citizens who are not Texas residents. In particular, Tex. Educ. Code, Section 54.051(d) requires that non-resident United States citizens pay tuition at a rate that is nine-times higher than the "in-state" rate available to unlawfully present aliens. Given this background:

1.  Did the district court rightly hold that Section 54.051(d) is preempted by Section 1623?

2.  Did the district court rightly hold that Appellee's members, who are subject to higher tuition under Section 54.051(d), have standing to challenge that statute?

3.   Was the district court within its discretion to permanently enjoin the application of Section 54.051(d) at the University of North Texas after a final merits determination that the statute was preempted?

# STATEMENT OF THE CASE

## *Statutory background*

In 1996, Congress passed a package of public benefit and immigration reforms collectively referred to as the "Illegal Immigration Reform and Immigrant Responsibility Act," or "IIRIRA." Among other things, IIRIRA prohibits states from providing certain benefits to "unlawfully present aliens." 8 U.S.C. § 1621(a)

But, in a nod to federalism, IIRIRA expressly allows states to provide certain benefits to unlawfully present aliens, subject to two conditions. First, the state must enact "a State law after August 22, 1996, which affirmatively provides for such eligibility." 8 U.S.C. § 1621(d). Second, the state's choice to provide these benefits comes at a cost—the state cannot provide a "post-secondary education benefit" to an unlawfully present alien on the basis of residence within a state, unless it also makes United States citizens "eligible for such a benefit (in no less an amount, duration, and scope) *without regard to whether the citizen or national is such a resident*." 8 U.S.C. § 1623 (emphasis added).

This is no small condition. A "post-secondary education benefit" that is commonly attached to "residence within a state" is "in-state"

tuition at state universities. App. Br. at 16. And as both amici and Appellants have pointed out, the ability to charge United States Citizens from other states higher out-of-state tuition rates is a significant source of revenue for state schools.[1]

Despite this federal disincentive, Texas was one of several states that took advantage of the opportunity provided by 8 U.S.C. § 1621(d). In 2001, Texas amended its tuition laws to clarify that unlawfully present aliens could be eligible for in-state tuition on the basis of residence. See Acts 2001, 77th Leg., 2001 Tex. Ch. 1392, 2001 Tex. HB 1403, Sec. 2, effective June 16, 2001. Indeed, Texas schools like the University of North Texas (UNT) advertise the availability of this benefit and encourage unlawfully present aliens to apply. ROA.792.

At the same time, however, Texas law does not make United States citizens eligible for in-state tuition "regardless of residence" as required by Section 1623. Instead, United States citizens who fail to establish residency are required by Section 54.051(d) to pay tuition at the higher non-resident rate. Tex. Educ. Code § 54.051(d). In practice, this rate is

---

[1]    App. Br. at 15; Brief for the Tx. Bus. Leadership Council, et. al. as Amicus Curiae Supporting Appellants at 31–32; Brief for President's Alliance as Amicus Curiae Supporting Appellants at 23–30.

approximately nine-times higher than that paid by unlawfully present aliens who qualify for in-state tuition. *Young Conservatives of Tex. Found. v. Univ. of N. Tex.*, No. 4:20-CV-973-SDJ, 2022 U.S. Dist. LEXIS 114210, at \*17 (E.D. Tex. June 28, 2022). This difference in price is significant. In 2022, nonresident students at UNT paid $12,240 more per semester than unlawfully present aliens who qualified for in-state tuition.[2]

### *Factual Background*

Appellee, the Young Conservatives of Texas (YCT), is a conservative student organization with a chapter at UNT. ROA.260–262. There is no dispute that YCT has members at UNT who are United States citizens forced to pay the higher rate mandated by Section 54.051(d). App. Br. at 6. Indeed, the increased burden of this higher rate was so significant that one of YCT's members was dropped from her classes due to an inability to pay. ROA.1056.

To avoid these sorts of injuries, YCT filed the present lawsuit against the University officials at UNT tasked with the application and

---

[2]     https://admissions.unt.edu/tuition-costs-aid

enforcement of Section 54.051 (d).  ROA.30.[3]  YCT's lawsuit sought a declaration that the current application of Section 54.051 (d) to United States citizens at UNT was preempted by federal law and an injunction prohibiting the continued application of Section 54.051 (d) to United States citizens at UNT.  ROA.38–39.

### *District court proceedings*

After years of litigation, the case was decided on cross motions for summary judgment.  First, the district court concluded that YCT had standing to sue on behalf of its members, because: (1) YCT's members were subject to the higher rates required by Section 54.051(d) and therefore would have standing to sue in their own right; (2) YCT's challenge to disparate tuition rates for United States citizens was germane to YCT's mission; and (3) the participation of individual members was not required because the case turned on pure questions of law and sought only declaratory and injunctive relief. ROA.1044–1050.

Second, the district court held that defendants Smatresk and Goodman were proper parties under *Ex parte Young,* 209 U.S. 123 (1908),

---

[3]     For ease of drafting, YCT has referred to the University officials in this case collectively as "UNT."  However, to avoid any confusion, YCT notes that its claims arise under *Ex parte Young* and are therefore directed solely at the listed university officials and not UNT as an entity.

because: (1) they were both tasked by statute to apply Section 54.051(d) and to oversee its enforcement; and (2) they had both actively overseen the application of Section 54.051 (d) at UNT. ROA.1050–1057.

Third, the district court held that Section 54.051 (d) was preempted under both express and implied preemption, because it requires precisely what Section 1623 forbids. ROA.1059–1074. As the district court put it: "Section 1623(a) expressly forbids States from denying United States citizens eligibility for a postsecondary education benefit based on nonresident status if unlawfully present aliens are eligible for that benefit based on residence within the State." ROA.1062.

Finally, the district court concluded that each of the factors for injunctive relief was met because: (1) YCT had succeeded on the merits; (2) the ongoing application of an unconstitutional tuition statute to YCT's members would irreparably harm them; (3) UNT's budgetary concerns could not trump its constitutional obligations; and (4) an injunction would serve the public interest by enforcing the limitations of our constitutional structure. ROA.1074-1077.

### *UNT complies with the district court injunction*

UNT immediately complied with the district court's injunction.  In the summer semester of this year, UNT did not charge United States citizens the unlawful rate mandated by Section 54.051(d).  App. Br. at 15.  Instead, UNT voluntarily chose to charge United States citizens the same in-state tuition rate it had previously provided to unlawfully present aliens.  *Id*; *see also* App. Br. at 55.

Going forward, UNT claims that this approach will result in 5.7-million-dollar reduction in its annual revenues.  App. Br. at 15.  To put that number in perspective, 5.7 million dollars amounts to a 0.68% reduction in UNT's annual revenues.  *Young Conservatives of Tex. Found. v. Univ. of N. Tex.*, No. 4:20-CV-973-SDJ, 2022 U.S. Dist. LEXIS 114210, at *15 (E.D. Tex. June 28, 2022)

In the four months since the injunction was entered, neither the Texas Attorney General nor the Texas Legislature have taken action to support UNT or contradict the district court's interpretation of state law.

### *UNT's stay motions*

More than a month after the district court's final judgment, UNT filed a motion to stay the district court's injunction with that court.  42

days later, UNT filed a similar motion in this Court. Both motions were denied.

## SUMMARY OF THE ARGUMENT

Under Federal law, states may not make unlawfully present aliens eligible for in-state tuition on the basis of residence and simultaneously deny in-state tuition to United States citizens on the basis of residence. There is no dispute that Texas law does both things at the same time. Texas law is therefore preempted, and the district court's judgment should be affirmed.

UNT endeavors to make this case seem more complicated than it is. First, UNT argues that Section 1623 cannot be read as preemptive, because it lacks any "explicit preemption statement." But preemption does not require any "magic words." And even if it did, Section 1623's text shows clear preemptive intent. Indeed, every court to consider the issue has had no problem reading Section 1623 as a preemption statute.

Second, UNT argues that Section 54.051(d) is not preempted because the primary purpose of Section 1623 was to limit the availability of in-state tuition to unlawfully present aliens, not to restrict the ability of states to charge out of state tuition. But the text of Section 1623 is

agnostic on how states must comply with its mandates. A state may *either*, make unlawfully present aliens eligible for in-state tuition on the basis of residence, *or* it may charge United States citizens out-of-state tuition on the basis of residence. It simply cannot do both at once. Because Section 54.051 (d) requires that UNT do both at once, it is preempted.

Third, UNT argues in the alternative that even if Section 1623 can be read as is preemptive, there is no conflict with Texas law because eligibility for resident tuition in Texas is not based on residence. But a plain reading of Texas's tuition statutes shows that resident tuition may be established in three ways, each of which explicitly requires a showing of residence. UNT's argument therefore fails.

Finally, UNT argues that the district court improperly read 1623 as creating a stand-alone right to in-state tuition, which the statute does not do. But the district court merely obeyed the conditions set by Section 1623. The practical result of that decision has been that Section 54.051(d) is enjoined and YCT's members have received in-state tuition. But that is not because Section 1623 conveys some stand-alone right to in-state tuition. It is because a law that violates the conditions set by

Section 1623 is void.  The Texas legislature remains free to resolve the conflict any way it likes.

Having failed to prevail on the merits, UNT turns to standing.  But standing is also more straightforward than UNT suggests.  YCT challenged a state law that requires its members to pay tuition rates nine-times higher than what federal law allows.  Standing for such challenges is well established.

UNT raises three objections.  First, UNT argues that any injuries caused by its unlawful tuition rates are "self-inflicted" because YCT's members chose to go to college in Texas.  But there is no basis for UNT's proposed expansion of the concept of "self-inflicted harm." Indeed, under UNT's theory, historic civil rights claimants would have lacked standing to challenge segregation practices at colleges in the South because they voluntarily "chose" to attend school there.

Second, UNT objects that YCT's injuries cannot be traced to the passage of Section 54.051(d), because Section 54.051(d) was lawful when passed, and did not become unlawful until Section 1623 was passed years later.  But this confuses *whether* an injury is traceable to a statute, with *when* that injury becomes unlawful. There is no dispute that Section

54.051(d) causes YCT's member's injuries.  The fact that those injures would not have been unlawful twenty-five years ago (when federal law was different) is wholly beside the point.

Third, UNT argues that even if Section 54.051(d) is preempted, an injunction cannot redress YCT's injuries because UNT is allegedly powerless to charge out-of-state students anything other than the rate proscribed in Section 54.051(d).  But this is refuted by both Texas law and UNT's own response to the district court's injunction.  As the district court rightly pointed out, Texas law allows universities to charge any rates it "considers necessary for the effective operation of the institution," provided that those rates do not conflict with other Texas laws.  Thus, once Section 54.051(d) was declared void and enjoined, UNT was free to adopt a rate for out-of-state students that complied with federal law.  Indeed, UNT admits that it has done so.  Redressability is therefore established.

Finally, UNT turns to the remedy entered by the district court.  UNT argues that even if Section 54.051(d) is preempted, enjoining its application at UNT was an abuse of discretion, because requiring that UNT comply with federal law would reduce the University's projected

annual revenue by 0.68%. But UNT's minor budgeting concerns cannot justify leaving an unlawful statute in effect after a final merits determination holding that statute to be unconstitutional. The district court's judgment should be affirmed.

## STANDARD OF REVIEW

UNT has appealed both the grant of summary judgment in favor of YCT and the issuance of a permanent injunction. This Court reviews a summary judgment ruling *de novo* and the granting of a permanent injunction for abuse of discretion. *Robinson v. Orient Marine Co.*, 505 F.3d 364, 365 (5th Cir. 2007) (summary judgment); *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (per curiam) (permanent injunctions).

## ARGUMENT

## I.  THE DISTRICT COURT RIGHTLY HELD THAT SECTION 54.051(d) IS PREEMPTED BY THE PLAIN TEXT OF SECTION 1623

Preemption claims are based on a simple premise—a state law that conflicts with a validly enacted federal law is void. *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985). By necessity, preemption claims often focus on statutory text. But, at bottom, preemption claims find their source in the Supremacy Clause of the

United States Constitution. *Torres v. Precision Indus.*, 938 F.3d 752, 755 (6th Cir. 2019). A state law which contradicts a validly enacted federal statute is unconstitutional. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 388 (2000).

Preemption can take three forms: (1) express preemption; (2) conflict preemption; and (3) field preemption. *Est. of Miranda v. Navistar, Inc.*, 23 F.4th 500, 504 (5th Cir. 2022). Only the first two types of preemption are at issue in this case.

## A.    UNT's application of Section 54.051 (d) to United States citizens is expressly preempted by Section 1623

First, the district court rightly held that UNT's current application of Section 54.051(d) to United States citizens is barred by express preemption. A statute is barred by express preemption when preemptive intent is clear from the text Congress adopted. See *Est. of Miranda*, 23 F.4th at 504 (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 109 (1992) (Kennedy, J., concurring)). In such cases, a court does not "invoke any presumption against pre-emption" but instead focuses on the plain wording of the statute, "which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Cal.*

*Tax-Free Trust*, 579 U.S. 115, 125 (2016) (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011)).

In this case, Congress's preemptive intent is clear. Section 1623 provides that: "*Notwithstanding any other provision of law*, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State . . . for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit . . . without regard to whether the citizen or national is such a resident." 8 U.S.C. § 1623 (emphasis added).

With regard to in-state tuition, there is no dispute that this text prohibits state universities from doing two things simultaneously: (1) making unlawfully present aliens eligible for in-state tuition on the basis of residence within a state, and (2) denying in-state tuition to United States citizens who are not residents of that state. See App. Br. at p. 24 (agreeing that Section 1623 prohibits both things from happening at once);[4] see also *State ex rel. Brnovich v. Maricopa Cty. Cmty. Coll. Dist.*

---

[4]     Despite this general agreement, UNT strangely focuses a large portion of its argument on the district court's stylistic decision in *some* portions of its opinion to simplify Section 1623's rule into a more easily readable "if/then" conditional—*i.e.*, "*If* a State makes an unlawfully present alien eligible for a postsecondary education benefit on the basis of state residency, *then* it must make a United States citizen

*Bd.*, 243 Ariz. 539, 543 (2018) (holding that Arizona could not make unlawfully present aliens eligible for in state tuition because it "has not made in-state tuition available to all U.S. citizens and nationals without regard to residence."); *Equal Access Educ. v. Merten*, 305 F. Supp. 2d 585, 606 (E.D. Va. 2004) ("post-secondary institutions need not admit illegal aliens at all, but if they do, these aliens cannot receive in-state tuition unless out-of-state United States citizens receive this benefit.")

In direct contradiction to this mandate, Texas law simultaneously: (1) makes unlawfully present aliens eligible for in-state tuition on the basis of residence within Texas, and (2) denies in-state tuition to United States citizens who are not residents of Texas. See Tex. Educ. Code, §§ 54.052, 54.053 (making aliens eligible); App. Br. at 6 (admitting that

---

eligible for the same benefit regardless of whether the citizen is such a resident." App. Br. at 26. Apparently, UNT contends that the court was required at all times to repeat the statutory text in its original (and inherently less-readable) "*not* A, *unless* B" format. *See, e.g., Id.* (complaining about the district court's "simple rule").

But, there can be no dispute that "*not* A, *unless* B" is logically equivalent to "*if* A, *then* B." See, [https://www.alphascore.com/post/quick-lsat-tip-unless-statements-simplified](https://www.alphascore.com/post/quick-lsat-tip-unless-statements-simplified). And even if there were a difference in meaning between the two the phrasings—and there is not—it had no effect on the outcome of the case. Whether phrased as an "if/then" statement (as the district court sometimes put it), or as a "not/unless" statement (as preferred by UNT), there is no dispute that Section 1623 prohibits a university from simultaneously: (1) making unlawfully present aliens eligible for in-state tuition on the basis of residence within a state, and (2) denying in-state tuition to United States citizens who are not residents of that state. App. Br. at 24. That agreed reading resolves the case.

aliens are eligible); Texas. Tex. Educ. Code, § 54.051(d) (requiring that United States citizens pay higher tuition on the basis of residence).

Given this direct conflict between state and federal law, the district court rightly found express preemption.

**B.    UNT's application of Section 54.051(d) to United States citizens is also barred by conflict preemption, because university officials cannot simultaneously comply with Section 54.051(d) and the demands of Section 1623**

Even if express preemption did not apply, the district court also rightly held that UNT's current application of Section 54.051(d) to United States citizens is barred by conflict preemption.  Under the principles of conflict preemption, a "state law is pre-empted if that law actually conflicts with federal law." *Cipollone v. Liggett Grp.*, 505 U.S. 504, 516 (1992).  This can occur under either of two circumstances: (1) "where compliance with both state and federal law is impossible;" or (2) "where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (internal quotation marks omitted).

Here, compliance with both state and federal law is impossible.  As explained above, Section 1623 prohibits states from simultaneously: (1) making unlawfully present aliens eligible for in-state tuition on the basis

of residence within a state, and (2) denying in-state tuition to United States citizens who are not residents of that state.

There is no reasonable dispute that Texas law makes unlawfully present aliens eligible for in state tuition on the basis of residence. Tex. Educ. Code, §§ 54.052, 54.053 (making aliens eligible). Indeed, UNT has admitted as much. App. Br. at 6. (admitting that aliens are eligible) ROA.915 (UNT President admitting same). And UNT actively advertises the availability of this benefit for unlawfully present aliens on its campus. ROA.792.    Therefore, federal law prohibits UNT from simultaneously denying in-state tuition to United States citizens who are not residents of that state. 8 U.S.C. § 1623.

In direct contradiction to this rule, Section 54.051(d) requires that UNT charge United States citizens out-of-state tuition on the basis of residence. UNT officials therefore cannot follow the mandates of federal law and Section 54.051(d) at the same time.

Indeed, despite multiple rounds of briefing, UNT has never been able to provide a single example of how a university official could both: (1) make United States citizens eligible for in-state tuition without regard to residence, as required by federal law, and (2) charge United

States citizens out-of-state tuition as required by Section 54.051(d). The district court therefore rightly held that the current application of Section 54.051(d) to United States citizens is barred by conflict preemption.

### C.   UNT'S arguments against preemption have no basis in law

Faced with this straightforward approach, UNT raises four arguments, each of which fail.

### 1.   Preemption does not require any magic words

First, UNT argues that the district court's finding of express preemption was improper because the text of Section 1623 does not contain an "explicit preemption statement." App. Br. at 29. But Congress is not required "to employ a particular linguistic formulation when preempting state law." *Coventry Health Care of Mo., Inc. v. Nevils*, 137 S.Ct. 1190, 1199 (2017). Nor has the Supreme Court ever "required any particular magic words" in express preemption cases. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 112 (1992) (Kennedy, J., concurring). Rather, courts must determine statutory intent from the language and structure of the statute as a whole. *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990).

Here, Section 1623 provides that *"[n]ot withstanding any other provision of law"* state eligibility standards for post-secondary education benefits must meet certain criteria. 8 U.S.C. 1623 (emphasis added). If the purpose of that language is not to preempt certain state laws regarding eligibility for post-secondary education benefits, it is difficult to imagine what its purpose would be. Indeed, no court to consider the issue has ever held that Section 1623 was not designed to preempt state laws. *See, e.g.*, *Brnovich*, 243 Ariz. at 543 (reading Section 1623 as a preemption statute.); *Martinez v. Regents of Univ. of Cal.*, 50 Cal. 4th 1277, 1284 (2010) (same); *Equal Access Educ.*, 305 F. Supp. 2d at 606 (same). UNT's argument therefore fails.

### 2. The best indication of legislative intent is the text of the statute Congress adopted

Next, UNT objects that the district court's holdings on express preemption and conflict preemption are contrary to Section 1623's intent. According to UNT, the intent of Section 1623 was solely to restrict the availability of in state tuition to unlawfully present aliens. App. Br. at 24-25, 29-30, 31, 32-33. It therefore cannot be read to preempt UNT from charging United States citizens out of state tuition. *Id.*

But the best indication of Congress's intent, is the text it adopted. *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011). Here, Congress could have banned unlawfully present aliens from receiving benefits all together—as UNT suggests—but it did not do so. Instead, Congress placed a condition on the provision of those benefits. Namely, that benefits cannot be provided to unlawfully present aliens on the basis of residence, unless they are also provided to United States citizens, regardless of residence. 8 U.S.C. § 1623.

To be sure, Congress may have placed that condition on providing benefits to unlawfully present aliens in order to discourage the practice. But the text Congress enacted is wholly agnostic on how universities choose to comply with its terms. Under the plain text of Section 1623, a university may *either*, make unlawfully present aliens eligible for in-state tuition on the basis of residence, *or* it may charge United States citizens out-of-state tuition on the basis of residence. It simply cannot do both at once. 8 U.S.C. § 1623; see also, App Br. at 24 (agreeing that both practices may not lawfully occur at once). Because Section 54.051(d) requires that UNT do both at once, it is preempted.

21

### 3.   Contrary to UNT's assertion, eligibility for resident tuition is based on residence

Next, UNT argues in the alternative that Section 1623 does not apply because resident tuition in Texas is not determined "on the basis of residence." App. Br. at 33.  However, as the district court rightly recognized, every avenue for in-state tuition under the Texas Education Code turns on whether the student is a resident within the State. *See* Tex. Educ. Code § 54.052 (requiring a showing of "domicile" or "residence" for each category); Tex. Educ. Code § 54.0501(3) (defining "domicile" as "a person's principal, permanent *residence...*") (emphasis added).  UNT's argument therefore flatly contradicts Texas law.

UNT points to *Martinez v. Regents of Univ. of California*, 241 P. 3d 855 (Cal. 2010), which held that California's in-state tuition program was not preempted by Section 1623, because it did not turn on residence. But under California law, a student could qualify for in-state tuition *without showing residence* if they attended high school in California for at least three years and met other statutory requirements.  *Martinez*, 241 P.3d at 864 (citing Cal. Educ. Code § 68130.5).  For example, "some students who live in an adjoining state or country are permitted to attend high school in California in some circumstances, even though they are not

California residents." *Id.* The "children of parents who live outside of California but who attend boarding schools in California might attend California high schools for three years, yet not be California residents." *Id.* And "those who attended high school in California for three years but then moved out of the state and lost their residency status would apparently be eligible for the exemption if they decided to attend a public college or university in California." *Id.*

None of that is true in Texas. Section 54.052 is clear that a student may establish residency only if she attended a Texas public high school "*and…maintained a residence* continuously in this state for the three years preceding the date of graduation…*and* the year preceding the census date of the academic term in which the person is enrolled in an institution." (emphasis added). UNT's reliance on *Martinez* is therefore misplaced.

UNT counters that even if residency is *a factor* in Texas, the existence of possible additional requirements for in-state tuition beyond residency, such as attending high school in Texas, demonstrate that in-state tuition does not turn on "mere residency," and therefore does not

trigger Section 1623. App. Br. at 34. But this argument fails for at least two reasons.

First, it reads additional requirements into the statute that are not in the text. Section 1623 does not restrict state decisions to provide benefits "on the basis of *mere* residency" or "*solely* on the basis of residence." It restricts state decisions to provide benefits "on the basis of residence." 8 U.S.C. 1623. In other words, Section 1623 is triggered anytime residency is a necessary (even if not a sufficient) aspect of obtaining a benefit. A court should not read additional requirements into a statute that are not there. *Alabama v. North Carolina*, 560 U.S. 330, 352 (2010) ("We do not—we cannot—add provisions to a federal statute.")

Second, and more importantly, under UNT's alternative reading, Section 1623 would never restrict the availability of benefits at *any* school, because no tuition program is—or can be—based *solely* on residence. Indeed, simply requiring that a student be admitted to UNT, or be present on the first day of class, to receive in-state tuition would be "an additional substantive requirement [in addition to residence], thus precluding conflict with federal law." App. Br. at 35. Such a reading would render Section 1623 meaningless. UNT's argument therefore fails.

### 4.    The cases cited by UNT do not help its argument

Finally, UNT string cites several cases that allegedly stand for the proposition that Section 1623 does not create a standalone "right" or "entitlement" to in-state tuition.  App. Br. 24-25.  But the district court did not hold that Section 1623 creates any standalone right or entitlement to in-state tuition.  Indeed, the court expressly rejected UNT's insistence that YCT needed to establish such a right to prevail. See *Young Conservatives of Tex. Found. v. Univ. of N. Tex.*, No. 4:20-CV-973-SDJ, 2022 U.S. Dist. LEXIS 114210, at *6 (E.D. Tex. June 28, 2022) ("plaintiff need not have suffered an invasion of a legal *right*.") (emphasis in original).

This makes sense. To prevail in this case, YCT has never been required to establish a standalone "right" or "entitlement" to in-state tuition.  YCT sought prospective injunctive relief under *Ex parte Young* 209 U.S. 123 (1908).  To prevail on an *Ex parte Young* claim, YCT was only required to show that the application of Section 54.051(d) at UNT is an ongoing violation of federal law that injures YCT's members.  *See Freedom from Religion Found., Inc. v. Mack*, 4 F.4th 306, 312 (5th Cir. 2021); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320,

326 (2015) (noting that under *Ex parte Young* a court may issue an injunction upon finding that a state law is preempted). That burden has been met.[5]   UNT's insistence that the district court must have read Section 1623 as creating a right is therefore not only demonstrably untrue, but irrelevant.

None of the cases cited by UNT change this outcome.   For example, the language UNT cites from *Day v. Bond*, 500 F.3d 1127, 1138-39 (10th Cir. 2007) involved whether Section 1623 created an independent cause of action. But, as explained above, YCT has never claimed that Section 1623 creates a standalone cause of action.   YCT's claims are pled in equity under *Ex parte Young*—an issue not addressed in *Day*. [6]

*Equal Access Educ.*, 305 F. Supp. 2d at 606, is likewise unhelpful. In that case, the plaintiffs claimed that Section 1623 preempted a state

---

[5]    This issue was fully litigated in YCT's favor below, and UNT has abandoned any argument that *Ex parte Young* does not apply. See, e.g., *Young Conservatives of Tex. Found. v. Univ. of N. Tex.*, No. 4:20-CV-973-SDJ, 2022 U.S. Dist. LEXIS 114210, at *14, (E.D. Tex. June 28, 2022) ("Yet, when arguing that they are likely to succeed on the merits of their appeal, [UNT] say[s] not a single word about *Ex parte Young*. That silence speaks volumes."); ROA 1056-59 (District Court's Opinion on Summary Judgement stating that "*Ex parte Young* is the whole ballgame." (internal citations omitted)); ROA 463-473 (District Court's Opinion on Motion to Dismiss holding that "Young Conservatives' preemption challenge to Section 54.051(d) of the Texas Education Code, therefore, may proceed under *Ex Parte Young*.").

[6]    *Day* is also inapposite for a host of other reasons discussed by the district court below. See *Young Conservatives of Tex. Found. v. Univ. of N. Tex.*, No. 4:20-CV-973-SDJ, 2022 U.S. Dist. LEXIS 114210, at *9 (E.D. Tex. June 28, 2022).

law denying admission to unlawfully present aliens because Section 1623 "implicitly recognized that illegal aliens might be attending public post-secondary institutions and has not acted to prohibit them from doing so." *Id*. The court rejected this argument, holding that Section 1623 does not require that universities admit unlawfully present aliens at all, it merely places a condition on their receipt of in-state tuition. *Id*. The court said nothing whatsoever about whether United States citizen can sue when a university violates this rule, what the remedy for that violation would be, or whether Section 1623 "creates rights."

*Brnovich*, 243 Ariz. at 540, involved a challenge by the state attorney general to a state community college program that provided in-state tuition rates to unlawfully present aliens. The court concluded that the program was preempted under Section 1623 because it provided benefits to unlawfully present aliens without making "in-state tuition available to all citizens and nationals regardless of residence." *Id*. Like the other cases listed by UNT, the court in *Brnovich* said nothing about whether such claims could have been brought by United States citizens rather than the Attorney General of the state, or what the remedy would be.

Finally, UNT cites *Martinez*, 50 Cal. 4th at 1290. But that case actually cuts against UNT's argument. *Martinez* involved a preemption challenge brought by United States citizens to California's grant of in-state tuition to certain unlawfully present aliens. The plaintiffs' claims failed because the court concluded that California did not provide tuition to unlawfully present aliens on the basis of residence. *Id.* However, the court expressed no doubt that United States citizens forced to pay out-of-state tuition could bring a preemption claim under Section 1623, *if* the state were granting in-state tuition to unlawfully present aliens on the basis of residence.

For what it is worth, UNT is correct that nothing in Section 1623 requires that United States citizens *perpetually* receive in-state tuition. The Texas legislature remains free to remedy the conflict between its statutes and federal law by removing the eligibility for in-state tuition from unlawfully present aliens, or by tying unlawfully present alien tuition to something besides residence. But Texas has not chosen that path. If UNT would prefer that policy outcome, it should address those arguments to the Texas legislature, not this Court.

## II.    THE DISTRICT COURT RIGHTLY HELD THAT YCT HAS STANDING TO CHALLENGE A STATUTE THAT REQUIRES ITS MEMBERS TO PAY TUITION RATES THAT ARE NINE-TIMES HIGHER THAN WHAT IS ALLOWED UNDER FEDERAL LAW

UNT next objects that YCT lacks standing. But, as explained below, standing is also straightforward.  To determine whether an association like YCT has standing, courts consider three factors: (1) whether the association's members would otherwise have standing to sue in their own right; (2) whether the interests the association seeks to protect are germane to the organization's purpose; and (3) whether the claim asserted or the relief requested requires the participation of individual members in the lawsuit. *Tex. Entm't Ass'n v. Hegar*, 10 F.4th 495, 504 (5th Cir. 2021).

There is no dispute that factors two and three are met here. App. Br. at 51. UNT disputes only the first factor—*i.e.*, whether any of YCT's members would otherwise have standing to sue in their own right.  *Id.*

To have standing to sue in their own right, a plaintiff must show: (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision.  *Susan B. Anthony List v. Driehaus*,

573 U.S. 149, 157-58 (2014). When, as in this case, a plaintiff is the object of the challenged regulation, there is generally little dispute that these factors are met, because "[i]f a plaintiff is an object of a regulation there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015) (quotation omitted).[7]

Here, YCT challenges the validity of Section 54.051 (d)—a statute that mandates its members pay nine-times more in tuition than what federal law permits.   UNT does not dispute that YCT's members have been—and, but for the district court's injunction, would be—subject to the higher tuition rates mandated by Section 54.051 (d).  App. Br. at 6; *see also* ROA.1047-48.   YCT therefore has standing to challenge that statute.  *Contender Farms*, 779 F.3d at 264.

UNT raises three arguments in response. First, UNT claims that YCT's members lack standing because their injuries are "self-inflicted."

---

[7]     UNT claims that *Contender Farms* does not apply because YCT's members are not the "object" of Section 1623. App. Br. at 54. But *Contender Farms* turns on whether the plaintiff is the object of *the challenged regulation*.  YCT did not challenge Section 1623. It challenged the application of Section 54.051 (d). The question under *Contender Farms* is therefore whether YCT's members are the "object" of Section 54.051 (d). There is no dispute that they are.

App. Br. at 52. According to UNT, YCT's members waived their ability to challenge unlawful tuition practices when they voluntarily chose to attend school out of state where they knew they could be subject to higher tuition rates. *Id.*

But this approach expands the concept of "self-inflicted harm" too far. Under UNT's theory, a student attending a college with racially segregated cafeterias would be unable to challenge the constitutional validity of that practice if the college's cafeterias were already racially segregated at the time the student "voluntarily" chose to attend. According to UNT, any harm that student suffered under the pre-existing segregation practice would be "of the plaintiff's own making" because he knew the practice was in place when he enrolled. *Id.* at 52-53. UNT, tellingly, provides no authority for this approach.

Second, UNT argues that YCT's members' injuries are not traceable to Section 54.051(d) because that statute was in effect, and lawful, before Section 1623 was passed. App. Br. at 53-54. But this confuses *whether* an injury is traceable to a statute, with *when* that injury becomes a legal injury that is actionable in court. There is no dispute that YCT's members' injuries are directly caused by Section 54.051(d), which

mandates that they pay higher tuition. That is sufficient to establish traceability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (Traceability exists when there is a "causal connection between the injury and the conduct complained of…"). The fact that those injuries may have been legal before Section 1623 was passed (almost three decades ago) is irrelevant.

Finally, UNT claims that an injunction cannot redress YCT's members' injuries because, even if Section 54.051(d) is enjoined, UNT is allegedly powerless under Texas law to charge YCT's members in-state tuition rates. App. Br. at 55-56. But this ignores both the text of Texas's tuition statutes and UNT's own actions. Tex. Educ. Code Sec. 54.0513 makes clear that, in addition to amounts set by Section 54.051, the university may charge "any student an amount designated as tuition" that its governing board "considers necessary for the effective operation of the institution." As such, once Section 54.051(d) was enjoined, Section 54.0513 provided ample authority for UNT to set new rates that comply with federal law. Indeed, that is precisely what UNT did after the district court entered its injunction. App. Br. at 15.

UNT objects that nothing in the district court's order mandates that YCT's members receive in-state tuition rates, and therefore the fact that UNT has chosen to apply in-state rates is merely a practical consequence that is not sufficient to establish redressability. App. Br. at 55–56, n. 22. But this objection misunderstands how redressability works.  To have standing, a party need only show that it is likely that an order from the Court could provide some relief.  *See Brackeen v. Haaland*, 994 F.3d 249, 372-373 (5th Cir. 2021).  An injunction preventing the application of an unlawful tuition rate, provides "some relief" even if the Court doesn't affirmatively mandate what the new rate should be.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261-62 (1977) (Finding standing where injunction would remove legal barrier, even if desired practical outcome could not be guaranteed); *Brackeen*, 994 F.3d at 372-373 (removal of unlawful barrier to adoption sufficient for standing, even if adoption not guaranteed).  Put another way, an order that takes a plaintiff from "not eligible" to "may be eligible" has provided some relief. *See id*.

So too here. Section 54.051(d) mandated that UNT charge YCT's members unlawfully high rates. That barrier has now been removed,

leaving UNT free to charge YCT's members a lawful tuition rate—which UNT has done. The removal of that unlawful barrier is sufficient relief to satisfy standing.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ENJOINING THE APPLICATION OF SECTION 54.051(d) AT UNT AFTER A FULL MERITS DETERMINATION THAT THE STATUTE IS UNCONSTITUIONAL

Next, UNT argues that the district court abused its discretion in entering a permanent injunction. But there is nothing unusual about enjoining the application of an unconstitutional law after a final judgment on the merits.

Generally, the party seeking a permanent injunction must show: (1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest. *VRC LLC v. City of Dall.*, 460 F.3d 607, 611 (5th Cir. 2006).

In an express preemption case, however, a final merits determination that the law is preempted "carries with it a determination

that the other three requirements have been satisfied." *Id.* citing *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 783 (5th Cir. 1990).[8]

This makes sense. When a law is preempted, its continued application is unconstitutional under the Supremacy Clause. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 388 (2000); *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 271-272 (1977). And because neither the government nor the public have any legitimate interest in the application of an unconstitutional law, the remaining equitable factors in the injunction analysis largely collapse once there has been a final merits determination that the law is preempted. See *Nat'l Fed'n of Indep. Bus. v. DOL, OSHA*, 142 S.Ct. 661, 666 (2022) (refusing to balance equities once regulation was found to be unlawful); *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("Any interest OSHA may claim in enforcing an unlawful (and likely unconstitutional) ETS is illegitimate."); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d

---

[8]     UNT objects to the district court's reliance on *VRC* and *Trans World Airlines* but provides no evidence that either of those opinions are not good law. To the contrary, both *VRC* and *Trans World Airlines* are regularly cited for the above proposition in this circuit. *See, e.g., ESI/Employee Sols., L.P. v. City of Dall.*, 531 F. Supp. 3d 1181, 1189 (E.D. Tex. 2021)*; Air Evac EMS, Inc. v. Sullivan*, 331 F. Supp. 3d 650, 667 (W.D. Tex. 2018); *Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*, Civil Action No. 3:08-CV-1724-D, 2008 U.S. Dist. LEXIS 95991, at *13-15 n.4 (N.D. Tex. Nov. 25, 2008).

Cir. 2013) ("[T]he Government does not have an interest in the enforcement of an unconstitutional law.") (quoting *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)); *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Ga. Latino All. for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1269 (11th Cir. 2012) ("[E]nforcement of a state law at odds with [federal law] is neither benign nor equitable."); *Henry v. Greenville Airport Com.*, 284 F.2d 631, 633 (4th Cir. 1960) (noting that a court has "no discretion" to deny an injunction "to a person who clearly establishes by undisputed evidence that he is being denied a constitutional right.")

UNT objects to this approach (App. Br. at 47-48) but provides no example of a federal court leaving an unconstitutional law in effect after a final merits determination, simply because complying with the Constitution might be inconvenient or costly to the government.

Nevertheless, YCT follows the lead of the district court below and walks through each of the remaining injunction factors.

## A.    Continuing to apply an unconstitutional tuition statute to UNT's members would be irreparable harm.

The district court rightly held that YCT's members would suffer irreparable harm in the absence of an injunction for at least two reasons. First, being subject to an unconstitutional law is a form of irreparable injury. See *BST Holdings,* 17 F.4th at 618; *Awad*, 670 F.3d at 1131.

UNT argues that this principle is limited to injuries arising from violations of "constitutional rights" as opposed to injuries caused by a "structural constitutional violation." App. Br. at 40. But this Court has never drawn that distinction. See, e.g., *Trans World Airlines*, 897 F.2d at 784 (abrogated on other grounds) (violation of the Supremacy Clause was an irreparable harm, separate and distinct from the financial injuries in that case); *see also Texas v. United States EPA*, 829 F.3d 405, 434 (5th Cir. 2016) (recognizing that violations of federalism also can constitute irreparable injury).[9]

---

[9]    UNT cites a number of cases where this Court and others have rightly applied a *per se* irreparable harm principle to Bill of Rights provisions. But UNT tellingly does not cite a single case where this Court has held that the principle of irreparable harm is *limited* to Bill of Rights cases. To be sure, a *bare allegation* of a constitutional injury is not enough to establish irreparable harm, even at the preliminary injunction phase. But once a final judgment has been entered, the court is no longer presented with bare allegations of unconstitutionality—it is faced with unconstitutionality in fact.

This makes sense. "[T]he Constitution's core, government-structuring provisions are no less critical to preserving liberty than are the later adopted provisions of the Bill of Rights." *NLRB v. Canning*, 573 U.S. 513, 570-71 (2014) (Scalia, Roberts, Thomas, and Alito, concurring). Indeed, "'[s]o convinced were the Framers that liberty of the person inheres in structure that at first they did not consider a Bill of Rights necessary.'" *Id*. The Framers would have been shocked by UNT's position that the very structural limitations they saw as of *primary* importance were somehow less worthy of judicial protection than those contained in the Bill of Rights.  See *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 707 (2012) (Scalia, J., dissenting) ("[T]he Framers considered structural protections of freedom the most important ones.")

Second, YCT's members' injuries arising from the payment of unlawfully high tuition will be unrecoverable through this litigation and therefore independently constitute irreparable harm.  A harm is irreparable when "there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). Here,

there is no cause of action that would allow the recovery of damages. Injunctive relief is the whole ballgame.[10]

Without injunctive relief, plaintiffs will be forced to pay thousands of dollars more in tuition than what federal law allows. Some students may be forced to forgo classes all together. See ROA.1056 (noting that one YCT member had been dropped from her classes due to inability to pay out-of-state tuition). Due to sovereign immunity, none of these injuries will be compensated. These are textbook irreparable harms. See *Tatro v. Texas*, 625 F.2d 557, 564 (5th Cir. 1980) ("exclusion of plaintiff from the University's programs" constituted irreparable harm for which a TRO was granted); *Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F. Supp. 3d 511, 529 (S.D. Tex. 2020) (exclusion from school was irreparable

---

[10]     In its stay motion, UNT argued that YCT's members might be able to recover something after the fact through a state administrative process laid out in Tex. Gov't Code § 403.202. UNT has wisely abandoned that argument here. As the district court rightly noted, UNT was never able to establish that Tex. Gov't Code § 403.202 would apply to tuition collected in violation of federal law. *Young Conservatives of Tex. Found. v. Univ. of N. Tex.*, No. 4:20-CV-973-SDJ, 2022 U.S. Dist. LEXIS 114210, at *16 n.3 (E.D. Tex. June 28, 2022). Moreover, the hypothetical ability to recover something through a separate state process misunderstands the irreparable harm analysis. A harm is irreparable for injunction purposes "where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Texas v. United States EPA*, 829 F.3d 405, 434 (5th Cir. 2016) (citation omitted). The hypothetical availability of funds from a separate process "would not be a recovery made in the course of the litigation." See *Id*. (potential ability to recover funds from ERCOT through a separate process did not render harm reparable).

harm). *See also BST Holdings*, 17 F.4th at 618 ("complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.")  The district court therefore did not abuse its discretion in finding that this factor tilts in YCT's favor.

## B. A 0.68% reduction in UNT's proposed budget does not outweigh UNT's obligation to comply with the Constitution

The district court also did not abuse its discretion by holding that benefits of complying with the law outweigh any injuries allegedly sustained by UNT.  When "Congress expressly preempt[s] [an] area of regulation, the states ***are not injured*** by [an] injunction." *Trans World Airlines*, 897 F.2d at 784 (emphasis added). This makes sense. As this Court has explained, a party is not injured when the Court requires that they comply with a lawful statute that they should have been complying with all along. See *Mitchell v. Pidcock*, 299 F.2d 281, 287 (5th Cir. 1962).

UNT raises two arguments in response. First, UNT points to preliminary injunction and stay cases where this Court has held that an injunction which prevents the application of a validly enacted state law is a *per se* irreparable harm to the state. App. Br. at 42-43. But those cases involved stay motions or preliminary injunctions prior to a final

merits determination.  Those cases cannot rationally be extended to cover permanent injunctions *after* a final merits determination holding that a statute is unconstitutional.  After all, an "unconstitutional law is void, and is as no law." *Montgomery v. Louisiana*, 577 U.S. 190, 204 (2016).  And the state has no "legitimate interest" in enforcing unconstitutional government edicts.  See *BST Holdings,* 17 F.4th at 618.

Second, UNT argues that the equities in this case preclude injunctive relief because following the law will cost the university approximately 5.7 million dollars per year—a sum that amounts to only 0.68% of UNT's proposed budget. App. Br. at 44.  But the Supreme Court recently rejected this approach with far more alleged injuries on the line.  In *Nat'l Fed'n of Indep. Bus*, 142 S.Ct. at 666, the Court considered a preliminary motion seeking to stay the application of an OSHA regulation mandating certain private employees be vaccinated. The government argued that even if the regulation were found to be likely unlawful, the equities should prevent a stay because staying the regulation could cost "over 6,500 lives" and "hundreds of thousands of hospitalizations." *Id.* at 666. The Supreme Court rejected this argument,

holding that once it had found the regulation unlawful, "[i]t is not our role to weigh such tradeoffs." *Id*.

If thousands of lives and hospitalizations were not sufficient to leave an unlawful regulation in place *temporarily* prior to a final merits determination, then a 0.68% reduction in UNT's proposed budget, certainly does not warrant leaving an unlawful tuition practice in place *permanently* after a final merits determination.

## C.    Preventing UNT's ongoing violation of federal law serves the public interest

In one last attempt to salvage its unlawful tuition practices, UNT argues that the district court abused its discretion by finding that an injunction serves the public interest.  But as the district court rightly noted, it is always in the public interest to obey the Constitution. *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014).

Once again, UNT argues that cases finding a public interest in enforcing the Constitution are limited to individual rights cases, not cases involving structural limitations on government power.  App. Br. at 47. But this Court recently clarified that the "public interest is also served by maintaining our constitutional structure…" *BST Holdings,* 17 F.4th at 618-19.  And, as explained in section III, A., *supra*, UNT's

requested distinction between individual rights cases and structural cases would have been anathema to the Framers of the Constitution.

Even if some balancing of the equities were required, however, the injunction still serves the public interest. By UNT's own admission the injunction has resulted in substantially cheaper tuition for thousands of United States citizens. Additionally, the enforcement of Section 1623 will, no doubt, deter other universities from adopting policies that conflict with federal immigration law. These concrete interests outweigh a 0.68% reduction in UNT's proposed budget.

Finally, it is worth pausing to consider exactly what UNT is requesting here. UNT is not asking for a temporary administrative stay so that it has time to come into compliance with federal law. UNT admits that it has already come into compliance. Instead, UNT is asking that an unconstitutional law be left in place *indefinitely* because complying with federal law will cost the government money. Under UNT's theory, YCT's members will have spent years litigating the lawfulness of the tuition statute, won at the district court and on appeal, and despite this successful effort, would remain subject to the same unlawful tuition rates they successfully challenged. Such an approach would make a farce of

the judicial process.  The district court did not abuse its discretion in refusing to take such a novel approach.

## CONCLUSION

Many years ago, Texas decided to make unlawfully present aliens residing in Texas eligible for in-state tuition at state universities.  Some have argued that Texas's decision was sound policy, or just the right thing to do. That may be so.  But under current federal immigration law, Texas's decision comes with a cost—universities may no longer charge out-of-state United States citizens a higher tuition than the rate made available to those unlawfully present aliens.

For years, UNT has willingly and openly violated this law. Indeed, UNT actively encourages unlawfully present aliens to apply for in-state tuition, while simultaneously denying that benefit to United States citizens from other states.  As a result, thousands of UNT students, including YCT's members, have paid years' worth of unlawfully high tuition rates. The district court rightfully put an end to this practice. That judgment should be affirmed.

UNT objects to this outcome because it will affect its budget. But the Texas legislature is more than able to resolve that problem for UNT.

The Legislature has, thus far, chosen not to do so. Unless and until it does, UNT's policy arguments should be addressed to that body, not this Court.

Respectfully submitted,

/s/ Chance Weldon
ROBERT HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
CHANCE WELDON
Texas Bar No. 24076767
cweldon@texaspolicy.com
CHRISTIAN TOWNSEND
Texas Bar No. 24127538
ctownsend@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone: (512) 472-2700
Facsimile: (512) 472-2728

**Attorneys for Appellee**

**CERTIFICATE OF SERVICE**

I hereby certify that on August 24, 2022, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system.  Participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ Chance Weldon*
CHANCE WELDON

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,072 words.  This brief also complies with the type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced typeface.

Dated:     August 24, 2022          */s/Chance Weldon*
                                    CHANCE WELDON