# United States Court of Appeals for the Fifth Circuit

---

No. 22-40225

---

Young Conservatives of Texas Foundation,

*Plaintiff—Appellee,*

*versus*

Neal Smatresk, *President of the University of North Texas*; Shannon Goodman, *Vice President for Enrollment of the University of North Texas*,

*Defendants—Appellants.*

---

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:20-CV-973

---

ON PETITION FOR REHEARING EN BANC

Before Smith, Clement, and Wilson, *Circuit Judges.*

Per Curiam:

The court having been polled at the request of one of its members, and a majority of the judges who are in regular active service and not disqualified not having voted in favor (Fed. R. App. P. 35 and 5th Cir. R. 35), on the Court's own motion, rehearing en banc is DENIED.

No. 22-40225

In the en banc poll, one judge voted in favor of rehearing (Ho), and fifteen voted against rehearing (Richman, Jones, Smith, Stewart, Elrod, Southwick, Haynes, Graves, Higginson, Willett, Duncan, Engelhardt, Oldham, Wilson, and Douglas).

No. 22-40225

James C. Ho, *Circuit Judge*, dissenting from denial of rehearing en banc:

The State of Texas offers in-state illegal aliens a 90% discount on the tuition it charges at its universities to out-of-state U.S. citizens.

This is a blatant violation of federal law. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 prohibits states from granting lower tuition rates to in-state illegal aliens than to out-of-state U.S. citizens. *See* 8 U.S.C. § 1623(a).

So I'm not surprised that the district court held Texas law preempted by § 1623(a). But a panel of our court reversed. *See Young Conservatives of Texas Foundation v. Smatresk*, 73 F.4th 304, 308 (5th Cir. 2023), *rev'g* 597 F. Supp. 3d 1062 (E.D. Tex. 2022). I agree with the district court, and disagree with the panel. Accordingly, I dissent from the denial of rehearing en banc.

## I.

Federal law prohibits states from offering illegal aliens any postsecondary educational benefit that it does not offer to out-of-state U.S. citizens. It reads as follows:

> Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

8 U.S.C. § 1623(a). Put simply, states can't treat illegal aliens better than they treat U.S. citizens.

Yet that's undeniably what Texas law does. Since 2001, the Texas Legislature has directed that in-state illegal aliens are entitled to substantial

3

tuition benefits not granted to out-of-state U.S. citizens. *See* Tex. Educ. Code §§ 54.051 & 54.052.

Under Texas law, the overwhelming majority of U.S. citizens who come from one of the 49 other states must pay "900% higher" tuition than in-state illegal aliens. 73 F.4th at 310. *See also id.* at 308 ("$50 per semester credit hour" versus "$458 per semester credit hour").

By bestowing greater benefits on illegal aliens than U.S. citizens when it comes to postsecondary education benefits, Texas law conflicts with federal law. It is therefore preempted. *See, e.g.*, *California v. ARC America Corp.*, 490 U.S. 93, 100 (1989) ("[S]tate law is . . . pre-empted to the extent it actually conflicts with federal law, that is, when compliance with both state and federal law is impossible.").

## II.

The panel agrees that § 1623(a) "expressly preempts state rules that grant illegal aliens benefits when U.S. citizens haven't received the same." 73 F.4th at 313. It also agrees that that's precisely what Texas law does: "Texas allows illegal aliens who satisfy residency requirements to pay . . . lower tuition." *Id.* at 307. "[I]llegal aliens are eligible for Texas resident tuition. Out-of-state, nonresident American citizens are not." *Id.* at 308.

But the panel reversed the district court and denied relief. It held that "§ 1623(a) doesn't impose *any* duty to grant the same benefits to U.S. citizens. . . . Its sole focus is on improper benefits for illegal aliens." *Id.* at 313. According to the panel, the only thing courts can do under § 1623(a) to remedy unlawful inequality in favor of illegal aliens is to eliminate any tuition benefit for illegal aliens—it cannot cure any such disparity by extending the tuition benefit to U.S. citizens.

Put another way, the panel believes that it cannot remedy the discrimination by "leveling up" benefits for U.S. citizens—it can only "level down" benefits to illegal aliens. Yet the panel wouldn't do that either.

The decision to do nothing in the face of this blatant violation of federal law is mistaken for several reasons.

### A.

To begin with, I disagree with the panel's interpretation of § 1623(a). Nothing in the text of § 1623(a) forecloses a leveling-up remedy.

At its core, § 1623(a) announces a simple rule: "An illegal alien shall not be eligible, unless a citizen is eligible."

Nothing in that rule suggests courts cannot remedy unequal treatment of U.S. citizens by extending benefits to those citizens. To use an analogy, suppose a parent tells a child: "You shall not have dessert, unless you eat vegetables." Now suppose the child puts a cupcake on his otherwise empty plate. The child has obviously violated the parent's instructions. So what's the remedy? The parent could take back the cupcake. But the parent could also add vegetables to the child's plate instead. There's nothing in the parent's instructions that forecloses *either* remedy. If the parent decides to fix things by putting vegetables on the plate rather than remove the cupcake, surely the child can't accuse the parent of lying.

So how did the panel justify going the other way?

1. First, the panel focuses on the word "unless." It theorized that the district court wrongly "converted Section 1623(a)'s 'unless' clause—a condition precedent to granting a benefit to aliens—into an affirmative obligation to give citizens benefits granted to aliens." *Id.* at 312.

I disagree with the charge. If anything, it's the panel that "convert[s]" the meaning of the word "unless."

A sentence that is structured "Not A, unless B," is logically equivalent to "If not B, then not A."  C. Grant Luckhardt & William Bechtel, How to Do Things with Logic 32 (1994). And "If not B, then not A," is logically equivalent to "If A, then B." *Id.* at 34–35.

I'll explain these two steps with a simple analogy.

Consider the following example of a "Not A, unless B" proposition: "You will *not* graduate *unless* you maintain an average GPA above 1.5." *Id.* at 32 (emphasis added). This means that, "[i]f you do *not* receive a 1.5 average, then you will *not* graduate." *Id.* (emphasis added).

So as a matter of basic logic, "Not A, unless B" "can be converted into" "If not B, then not A." *Id.*

Now suppose you've graduated. If you've graduated, then you must have received at least a 1.5 average. "Therefore, 'If -B, then -A' does imply 'If A, then B.'" *Id.* at 35.

To summarize these two steps: "Not A, unless B" means "If not B, then not A." And "If not B, then not A" means "If A, then B."

Now apply this logic to § 1623(a). Again, the rule of § 1623(a) is essentially this: "An illegal alien shall not be eligible, unless a citizen is eligible." So as a logical matter, that must be equivalent to this: "If a citizen is not eligible, then an illegal alien shall not be eligible." And that in turn must be logically equivalent to this: "If an illegal alien shall be eligible, then a citizen is eligible."

2.   The panel also contends that the district court misunderstood the term "shall not be eligible." It claims that "shall not be eligible" must be given different meaning from "is eligible." It then accuses the district

No. 22-40225

court of replacing the phrase "if immigrants shall be eligible, U.S. citizens are," with "if immigrants are eligible, U.S. citizens shall be." 73 F.4th at 313.

But the panel's theory draws a distinction that ordinary usage does not bear. Consider this example: Article II of the Constitution says that "No Person except a natural born Citizen . . . *shall be eligible* to the Office of President." U.S. Const. art. II, § 1, cl. 6 (emphasis added). Suppose the Founders had replaced the term "shall be eligible" with "is eligible." Article II would then read "No Person except a natural born citizen *is eligible* to the Office of President." Surely the meaning of Article II has not changed. Yet the panel would seem to conclude otherwise.

There's no difference in meaning between "an alien shall not be eligible" and "an alien is not eligible." The panel claims otherwise, but cites no authority to support its reading.

**B.**

The panel not only erred as a matter of text and logic—it also declines to follow the Supreme Court's guidance when it comes to remedying unlawfully discriminatory laws.

When faced with an unlawfully discriminatory statute—that is, one that impermissibly grants a benefit to one class while denying it to another— a court has two options. It can level up—that is, extend the benefit to U.S. citizens. Or it can level down—that is, eliminate the benefit to illegal aliens.

"There are two remedial alternatives . . . when a statute [unlawfully] benefits one class . . . and excludes another from the benefit." *Sessions v. Morales-Santana*, 582 U.S. 47, 72 (2017) (quotations and citations omitted). "A court may either declare the statute a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may

7

extend the coverage of the statute to include those who are aggrieved by exclusion." *Id.* at 72–73 (cleaned up).

Moreover, the Supreme Court has made clear that "the preferred rule in the typical case is to extend favorable treatment." *Morales-Santana*, 582 U.S. at 77. "Ordinarily, we have reiterated, 'extension, rather than nullification, is the proper course.'" *Id.* at 74 (quoting *Califano v. Westcott*, 443 U.S. 76, 89 (1979)). The "extension of benefits is customary." *Id.* at 76.

### III.

If the panel had applied the remedial analysis set forth in cases like *Morales-Santana*, it might have identified some valid reason to level down in this case, notwithstanding the Court's "preferred rule" to level up. And if it had done so, its decision might be more persuasive.

But the panel didn't conduct that analysis. It just declared that the text of § 1623(a) foreclosed the need for any remedy, and stopped there.

So the panel opinion is wrong not just on the statutory issue, but also on the remedial analysis. Because even accepting the panel's reading—that § 1623(a) somehow forecloses the "preferred" remedy of leveling up—there's nothing in the text of § 1623(a) that forecloses a leveling down.

The very least the panel should've done, then, is to (1) make clear that Texas law unlawfully discriminates against citizens in violation of § 1623(a), and (2) remand so the district court can consider a leveling-down remedy.

Yet the panel did *neither* of these things. I see no justification for refusing to allow *either* a leveling-down or leveling-up remedy.

### A.

The panel admits that "[t]here may be valid preemption challenges to Texas' scheme here." 73 F.4th at 314. But it says the Young Conservatives

should lose because they didn't challenge the right provision of Texas law. I see a number of problems with this theory.

1.   To begin with, the panel never says which provision the Young Conservatives failed to challenge. Perhaps that's because the complaint named *every* relevant provision of the Texas Education Code. It named § 54.051, including (b), (c), (d), and (m). It also named § 54.052, including (a) and (a)(3). That covers every relevant provision cited by the panel. Most notably, it includes the provisions that the panel cites to show that Texas law requires that "illegal aliens are eligible for Texas resident tuition" while "[o]ut-of-state, nonresident American citizens are not." 73 F.4th at 308 (citing §§ 54.051(c)–(d) and § 54.052).

2.   Moreover, even if we ignored the complaint and assumed the Young Conservatives failed to cite the right provisions, the Supreme Court has made clear that plaintiffs are required to plead facts—not legal theories.

"A plaintiff . . . must plead facts sufficient to show that her claim has substantive plausibility." *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014). "'[I]t is unnecessary to set out a legal theory for the plaintiff's claim for relief.'" *Id.* (quoting 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1219, at 277–78 (3rd ed. 2004)).

Our circuit has dutifully applied *Johnson* on various occasions—including as recently as just last week. *See, e.g.*, *Rodgers v. Lancaster Police & Fire Dep't*, 819 F.3d 205, 207 n.2 (5th Cir. 2016) ("A complaint need not cite a specific statutory provision or articulate a perfect 'statement of the legal theory supporting the claim asserted.'") (citation omitted); *United States v. Harris*, __ F.4th __, __ (5th Cir. 2023) (same). So have other circuits. *See, e.g.*, *Quinones v. City of Binghamton*, 997 F.3d 461, 468 (2nd Cir. 2021) ("[T]he complaint identifies a single cause of action for retaliation and does not similarly label a cause of action for discrimination. But this failure is not fatal

here.") (following *Johnson*); *Koger v. Dart*, 950 F.3d 971, 974-75 (7th Cir. 2020) ("[c]omplaints plead grievances, not legal theories," so the plaintiff could invoke the Due Process Clause "at later stages of the suit" even where the complaint "initially relied only on the First Amendment").

Applying *Johnson* here, the Young Conservatives have undeniably alleged facts sufficient to show that their suit seeks to eliminate disparate treatment and ensure equality of treatment for U.S. citizens.

The panel opinion, to its credit, acknowledges this repeatedly. It notes that the Young Conservatives "repeatedly opposed the *disparate treatment* of aliens who are not lawfully present in the United States and United States citizens from other states with regard to tuition." 73 F.4th at 308 (emphasis added). It notes that "[w]hether U.S. citizens (or illegal aliens) are eligible for benefits is clearly germane to YCT's mission." *Id.* at 309 n.2. It notes that "*YCT is not asking us to make its members categorically eligible for in-state tuition*. Rather, YCT is asking us to stop UNT officials from charging an improper or unlawful price." *Id.* at 310 (emphasis added). It notes that "YCT contends that § 1623(a) requires that universities either make illegal aliens eligible for in-state tuition, or they can charge U.S. citizens out-of-state tuition," but "[t]hey cannot do both," and it is "*wholly agnostic on how universities choose to comply with its terms*." *Id.* at 314 (emphasis added).

These acknowledgements are unsurprising. After all, the complaint states that the Young Conservatives have "repeatedly taken stands on issues of higher education . . . , including . . . opposing the disparate treatment of students with regard to tuition rates." It complains that "the Texas Education Code allows aliens who are not lawfully present in the United States to be eligible for resident tuition, while denying that same benefit to United States citizens from outside of Texas." That's a problem, the Young

Conservatives allege, because "Federal law provides that all citizens must have access to at least the same level of educational benefits as such aliens."

The complaint seeks a declaration that Texas law is preempted by federal law, as well as a separate request for injunctive relief. It also seeks "[a]ll other and further relief that this Court may deem proper in law or equity." *See*, *e.g.*, *Serv. Mach. & Shipbuilding Corp. v. Edwards*, 617 F.2d 70, 76 (5th Cir. 1980); *Hobbs v. Thompson*, 448 F.2d 456, 475–76 (5th Cir. 1971).

The Young Conservatives also assembled an amicus coalition that echoes these same themes. Advocates for Victims of Illegal Alien Crime "objects to providing illegal aliens special benefits that are not available to Americans, including out-of-state Americans," and "creat[ing] incentives for illegal immigration by granting illegal aliens special benefits not available to all Americans." The Immigration Reform Law Institute likewise contends that "Federal law makes illegal aliens ineligible . . . for instate tuition at state universities that charge U.S. citizens . . . out-of-state tuition."

And the district court repeatedly agreed. It noted that the State of Texas can cure its violation of federal law either by leveling up or leveling down—but the one thing it *cannot* do is disfavor U.S. citizens. *See*, *e.g.*, 597 F. Supp. 3d at 1083 ("Federal law forbids States from simultaneously making unlawfully present aliens eligible on the basis of residence within the State for a postsecondary education benefit while denying that benefit to United States citizens."); *id.* at 1089 (supporting "[a]n injunction prohibiting UNT officials from simultaneously allowing unlawfully present aliens to pay nonresident tuition while denying that benefit to United States citizens based on residency—in violation of federal law and the Supremacy Clause").

All of this should be more than enough under *Johnson*.

3.   Finally, the panel decision also runs into another established principle—that it's the responsibility of the judiciary to determine the proper remedy in a case like this, regardless of what the parties request.

As the Supreme Court has instructed, the fact that a party "did not seek this outcome"—that is, a leveling-down remedy—"does not restrain the Court's judgment. The issue turns on what the legislature would have willed." *Morales-Santana*, 137 S. Ct. at 1701 n.29. "'The relief the complaining party requests does not circumscribe this inquiry.'" *Id.* (quoting *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 427 (2010)).

So even if the Young Conservatives had insisted on a leveling-up remedy, that would not relieve our court of the duty to determine whether a leveling-up or leveling-down remedy is appropriate in a case like this.

## B.

At a minimum, the panel should have vacated and remanded to give the Young Conservatives the opportunity to fix whatever defects it identified on appeal.

I go back to what the Supreme Court instructed in *Johnson*. It directed lower courts to "ward off further insistence on a punctiliously stated 'theory of the pleadings,'" by allowing "[parties], on remand, . . . an opportunity to add to their complaint." 574 U.S. at 12. Put simply, we "should freely give leave to amend a pleading when justice so requires." *Id.* (cleaned up). It's well within our discretion to vacate and remand to allow the parties to clarify the issues in dispute or the district court to consider alternative remedies to redress a demonstrated violation of law. *See, e.g.*, *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 383–84 (2008) ("Given the circumstances of this case and the unclear basis of the District Court's decision, the Court of Appeals should have remanded the case to the District Court for clarification.").

Our court dutifully followed these instructions just last week. *See Harris*, _ F.4th _. Our opinion acknowledged that, "[i]n the district court, Harris . . . did not explicitly name any statutes that might independently protect his religious freedom, such as the Religious Freedom Restoration Act of 1993 [or the] Religious Land Use and Institutionalized Persons Act of 2000." *Id.* at _ (citations omitted). He merely asserted "his religious belief as a special circumstance that could lessen the government's interest in involuntarily medicating him." *Id.* at _.

We concluded that, under *Johnson*, that was enough to warrant vacatur and remand—even though Harris failed to identify "any" relevant statute, and asserted only the facts behind his claim. "Harris was not required to name RFRA to invoke any protection it might offer him. He needed only to allege facts that, if true, would plausibly state a claim under the Act." *Id.* at _. So we granted vacatur and remand "for the district court to consider in the first instance whether RFRA or any other statutory religious-freedom protection applies." *Id.* at _.

If anything, the case for vacatur and remand is even stronger here than in *Harris*. Unlike Harris, the Young Conservatives *prevailed* in the district court. And while Harris was charged with threatening to assault a federal judge, the Young Conservatives are law-abiding citizens who are troubled by a decades-long practice of state officials deliberately denying equality of treatment to lawful U.S. citizens in plain violation of explicit federal law. So if remand was appropriate in *Harris*, it should've have been appropriate here.

## C.

The panel essentially tells the Young Conservatives: "Just file another lawsuit." That may sound perfectly fine to those of us who make our livelihoods in the legal system. But it's cold comfort to law-abiding U.S. citizens who are forced to conclude that they're getting a raw deal.

Because we all know what "just file another lawsuit" means. It means that Texas will continue to blatantly violate federal law while the litigation slowly churns. It means that Texas will continue to charge 900% higher tuition to U.S. citizens who lawfully reside in one of the other 49 states than to those who are not legally permitted to be here at all. Justice delayed is often justice denied.

Moreover, the panel's decision reminds me of what happened in *California v. Texas*, 141 S. Ct. 2104 (2021). There, as here, a district court granted relief to the plaintiffs. But there, as here, a higher court identified some defect in the plaintiff's prosecution of their case.

Justices Alito and Gorsuch dissented. But they noted that, under the majority's ruling, the plaintiffs could simply re-file. *See id.* at 2135 n.9 (Alito, J., dissenting) ("If the effect of the Court's decision is dismissal of this action for lack of Article III jurisdiction, the States may file a new action. . . . And in any event, many other parties will have standing to bring such a claim . . . . Our Affordable Care Act epic may go on.").

But then look at what happened next: To date, none of the plaintiffs in *California* have re-filed.

It's easy for judges to *think* we can predict what litigants will do next. But just as it's wrong for litigants to think they always know what a judge will do, it's wrong for judges to think they always know what a litigant will do. We certainly shouldn't assume that litigation costs the litigants nothing.

I don't know why the plaintiffs chose not to re-file in *California*. I don't know what Plaintiffs will choose to do here. I don't know what they'll think about this court dismissing their complaint in its entirety, when it could've just vacated and remanded to fix whatever modest defects the panel identified on appeal. I don't know what they'll infer from this court's lopsided vote against rehearing en banc.

No. 22-40225

I only know what I know. We could've vacated and remanded, but we didn't. We could've granted rehearing en banc, but we didn't. We could've taken this opportunity to enforce the federal guarantee of equality of treatment for U.S. citizens, but we didn't.

\* \* \*

United States citizenship is one of the greatest privileges this world has ever known. And the ability to obtain a quality education here is one of the most treasured components of the American dream. So it's entirely understandable why people from all around the world would want to come to America in search of a better life—for themselves and their children.

But a sovereign isn't a sovereign if it can't control its borders. Congress has enacted a number of restrictions to govern entry into our country. Our national objectives are undercut when states encourage illegal entry into the United States.

That's precisely what's at issue here. Congress enacted § 1623(a) to forbid states from treating U.S. citizens less favorably than illegal aliens when it comes to postsecondary education benefits. Yet that's exactly what Texas law does.

Whatever the ultimate remedy may be, it seems obvious that the State of Texas is violating federal law. We should stand by our distinguished colleague on the district court in saying so. The panel declined to do so. I respectfully dissent from the denial of rehearing en banc.